## Sparks's Appeal.

Testator by his will provided, "I hereby give, devise and bequeath to my son S. and to his heirs and assigns for ever, upon his attaining the age of twenty-one years, all my Shot Tower property, consisting of shot tower, buildings and lots of ground connected therewith * * * with all the appurtenances, machinery, fixtures and personal property therein and thereto belonging." At the date of the testator's death there was in the Shot Tower property a large quantity of manufactured shot. There was also a quantity of materials used in the manufacture of shot. It was the manifest design of the testator that his son should continue the business when he reached his majority. *Held*, that the son was entitled to the unmanufactured materials on the property at the date of testator's death, but that the provisions of the will could not be made to embrace the manufactured stock.

February 13th 1879. Before SHARSWOOD, C. J., GORDON, PAXSON, WOODWARD, TRUNKEY and STERRETT, JJ. MERCUR, J., absent.

Appeal from the Orphans' Court of *Philadelphia county :* Of January Term 1877, No. 120.

Thomas Sparks by his last will, dated October 8th 1872, and codicil thereto, dated December 18th 1873, appointed the Pennsylvania Company for Insurances on Lives and Granting Annuities, his executors, and left his property to his wife and children, among which latter was his only son, Thomas Weston Sparks. The executors having filed their first account, it showed a balance of about $350,000. George Junkin, Esq., was, by consent, appointed auditor to report distribution.

Thomas Sparks, the testator, owned, at the time of making his will, a shot tower and certain real estate adjacent thereto, situate near Second and Carpenter streets, in Philadelphia. This shot tower had been built in 1808, and owned by the testator's uncle, also named Thomas Sparks, who carried on the business of making shot there until his decease, when by his will he devised it to his nephew, the testator, who continued the same business until his death, on October 17th 1874.

At the time of making his will, October 8th 1872, the testator's only son, Thomas Weston Sparks, was eighteen years, three months and seventeen days old. By the 4th item of his will, Thomas Sparks devised as follows :

"Item Fourth. I hereby give, devise, and bequeath to my son, Thomas Weston Sparks, and to his heirs and assigns, for ever, upon his attaining the age of twenty-one years, all my Shot Tower property, consisting of shot tower, buildings and lots of ground connected therewith, situate on the south side of Carpenter street (late Johns), between Front and Second, in the late district of Southwark (now the Second ward), in the city of Philadelphia, with all the appurtenances, machinery, fixtures and personal property therein and thereto belonging. But in case my said son should die before

attaining the age of twenty-one years, then I order and direct that the same shall become and form part of my residuary estate. And it is my will, and I do hereby order and direct that during the minority of my said son, said Shot Tower property and appurtenances shall be rented as advantageously as may be by my executor, and the income thereof shall go into and form part of my said residuary estate. And my executors shall pay all taxes, water-rent and other charges whatsoever, and keep the same in good repair, and perpetually insured at the expense of my estate. And during the minority of my said son, or after his decease, should it occur before his attaining the age of twenty-one years, I authorize and empower my said executor, if deemed expedient, to sell and dispose of the said Shot Tower property, either at public or private sale, and to grant and convey the same to the purchaser or purchasers thereof, in fee-simple or otherwise, without said purchaser or purchasers being bound to see to the proper application of the purchase-money. And in case of a sale, I order and direct my executor to invest the proceeds of such sale in such securities, yielding an income as may be deemed best by my executors, such income to go to, and form part of my said residuary estate. And when, and as soon as my said son attains the age of twenty-one years, should such sale be made during his minority, then I order and direct that such securities or investments of the proceeds of sale shall be assigned, and I do hereby give and bequeath the same to my said son, Thomas Weston Sparks, for his own use for ever. But should he die during his minority, then such securities to become and form part of my residuary estate, as hereinbefore mentioned."

By the only codicil to his will, after ratifying and confirming his will in all other respects, the testator devised, inter alia, as follows :

"Second. Whereas, by item fourth of said will, I have devised and bequeathed to my son, Thomas Weston Sparks, all my Shot Tower property as in said item mentioned; and whereas, since that time I have purchased a lot of ground, known as the Old Swedes' Burial-ground, immediately adjoining, on the north, the Shot Tower property, and which I desire to form part thereof; now I hereby give, devise and bequeath, to my said son, and to his heirs and assigns for ever, all that my recent purchase known as the Old Swedes' Burial-ground."

In 1871, a year prior to the date of the will, the testator's son, Thomas Weston Sparks, then about seventeen years old, had left school and gone into his father's office to learn the business, and his father contemplated taking him into partnership. He remained in his father's office until the latter's death, a period of over three years, when he wanted but nine months of his majority.

There was always, at the shot tower, in addition to the machinery and fixtures, which formed part thereof, a stock of lead in bars, in actual process of manufacture, and in the shape of manufactured

[Sparks's Appeal.]

shot and bullets.   There was, also, at the office of the testator, in Walnut street, some manufactured stock unsold.   The total value of the stock manufactured and unmanufactured at the factory was $21,235.96 ; that at the store was worth $5608.29 additional.

The questions arising upon the will were whether, under the will, the son, Thomas Weston Sparks, was entitled to the stock at the factory, as well as in the store, or to either; or whether this stock all passed into the testator's residuary estate.

The auditor was of opinion that the testator did not give to his son the stock, manufactured and unmanufactured, and other material on hand at his death, but only the Shot Tower property and all its equipment, whether strictly attached to the freehold or consisting of items of personal property used in and belonging to the property for its use as a shot tower.

This report was excepted to by Thomas Weston Sparks, on the ground that under his father's will he was entitled to some $26,000 more than was awarded to him by the auditor.

The Orphans' Court overruled the exceptions and confirmed the report, saying : " We think that the testator intended to give his son only the real estate, machinery and utensils necessary to carry on the business of the shot tower, and not the manufactured and unmanufactured materials which happen to be there at the time of his decease."

From this decree Thomas Weston Sparks took this appeal.

*George W. Biddle* and *Eli K. Price*, for appellant.—Where one word particularizing one limited description of property, is followed in a will by general words, the first word used will not cut down the general words to property of the same character as that comprised in the simple word : Swinfen *v.* Swinfen, 29 Beav. 209 ; Arnold *v.* Arnold, 2 Myl. & K. 373.

The words "personal property therein and thereto belonging," include the lead unmanufactured and in process of manufacture, and the shot actually manufactured in the testator's shot tower, at the time of his death.

The words are " personal property therein *and* thereto belonging." The meaning of these words is " personal property therein and personal property thereto belonging." The word " and " is here used cumulatively.

The intent of the testator as gathered from his whole will, coupled with his intention to put his son into the business, demonstrates that he intended, by the fourth item of his will to, pass the whole of the Shot Tower property and stock thereof to his son, Thomas Weston Sparks, as a going concern.

*John G. Johnson*, for appellee.—The words of the will are the " Shot Tower property;" within such a subject-matter, shot, balls

and lead are not included. It was the personal property " therein," which possessed the characteristic of an *appurtenance*, of being a " belonging" of the " shot tower and buildings" the testator wished his son to take. The personal property he intended was such as was an " appurtenance of the realty." Shot and lead were not embraced in this intent.

Even were the words, " personal property therein and thereto belonging," first used broad enough to give to appellant all he claims, the context would render it impossible thus to construe them. The testator shows that what he meant to give to his son was something capable of being rented. It was also to be kept in " repair and perpetually insured" and the executors were authorized to " sell" and to " grant and convey" the same to purchasers " in fee-simple or otherwise." Surely those terms were not applied to " shot and lead."

The father did not give to the son the business, but only the appliances with which he could carry on one for himself, at the old location. If it was the business he meant to give, why did he not bequeath the bills receivable and cash which he used in it, together with the furniture of his Walnut street store, and the shot and lead therein contained? According to the season of the year in which he might happen to die, there might be $25,000 in shot and lead, and nothing in cash and bills receivable, or $25,000 in cash and bills receivable and nothing in shot and lead. According to the temporary condition of his business, the larger part of this shot and lead might be at the shot tower or in the store.

Mr. Justice WOODWARD delivered the opinion of the court, May 5th 1879.

This appeal has brought up a single question for determination. Thomas Sparks died on the 17th of October 1874. The fourth section of his will, which had been executed two years before, contained this provision: " I hereby give, devise and bequeath to my son, Thomas Weston Sparks, and to his heirs and assigns for ever, upon his attaining the age of twenty-one years, all my Shot Tower property, consisting of shot tower, buildings and lots of ground connected therewith, situate on the south side of Carpenter street, * * * with all the appurtenances, machinery, fixtures and personal property therein and thereunto belonging." The second section of the codicil, executed on the 18th of December 1873, made a similar gift, devise and bequest to his son of the lot known as the Old Swedes' Burial-ground, which the testator had purchased after making his will, adjoining the Shot Tower property, and which he desired should " form part thereof." The auditor found that at the date of the testator's death, there were stock and manufactured goods in the Shot Tower property of the value of $21,235.96. In this aggregate, drop-shot appraised at $13,213.55, and buck-

[Sparks's Appeal.]

shot appraised at $2038.12 were included. The balance amounted to $5984.29. It was made up of various items, consisting of bar, pig and black lead, of " sundry metals," of bagging, of arsenic, of gas, pea and egg coal, of pine wood and of new and old kegs. At the audit, Thomas Weston Sparks, the appellant, claimed that under the terms of his father's will, he was entitled to the value of the entire personal property, which had been inventoried as " Stock in factory." The claim was rejected by the auditor and his report was confirmed by the Orphans' Court.

The will of Mr. Sparks was very carefuly drawn. Out of the thirty-eight items by which he disposed of his estate, the formula " I give and bequeath," was adopted in thirty-four. These embraced all the bequests of personal property. In the second, a gift of real estate to his wife for life, and in the fourteenth, a gift of a house in Germantown, to his sister-in-law, Mrs. Thomson, for life were made, and the words, " I give and devise" were used. The phrase, " I give, devise and bequeath," was employed only in the gift to his son in the fourth item and in the residuary clause. The same phrase was used in the second section of the codicil, by which the Old Swedes' Burial-ground was given to his son. Throughout, there was manifest method in the use of terms. As " the lot immediately adjoining on the north the Shot Tower property" was to form part of it, the testator assumed that, like the other lots, it would become a depository for chattels belonging to or connected with the business, and he directed, therefore, that they with other such chattels should go to the devisee. It seems clear from a scrutiny of this elaborate instrument that its draughtsman employed no superfluous, ambiguous or senseless words.

What, then, was the purpose of the testator in adding to the devise of the Shot Tower property with its appurtenances, machinery and fixtures, a bequest to his son of " the personal property therein and thereto belonging?" The devise would have carried the fixtures, furniture and tools. The bequest meant to embrace something beyond them, or it had no meaning at all. It is the duty of all courts to give due effect to all the provisions of a dead man's will. No one of them is to be cast aside as jargon except where its absurdity is absolute. Mr. Sparks desired and designed that upon the happening of his own death, his son should be his successor in his business at the age of twenty-one. He had taken him from school at the age of seventeen, and had educated him in his office to this end. He knew—none could know so well—that the operations of the Shot Tower property would always require that large quantities of costly manufacturing materials should be kept at hand. If, at the moment of his death, these materials should go into the possession of his personal representatives, and form part of his residuary estate, the whole business would probably be crippled and deranged, and if the devisee should have no outside means,

would possibly be destroyed. It was to guard against this obvious contingency that the testator made the bequest of the personal property to his son. Lead, bagging, arsenic, coal, wood and kegs had become by their purchase and deposit in the factory part of the factory itself. As means and materials for carrying on the business, they had acquired the value that attaches to articles of prime necessity. Apart from such a connection, some of them may have had the value of the open market, and some of them may have been useless and worthless. When Mr. Sparks died, "the personal property" designed to be used in making shot had been appropriated to the purposes of the factory. It "belonged" to the Shot Tower property.

Nothing in the later provisions of the fourth section of the will is inconsistent with the view that has been taken of the intention of the testator. In the event of the death of the devisee in his minority, " the same," that is, the whole real and personal property devised and bequeathed, was to become part of the residuary estate. The "Shot Tower property and appurtenances" were directed to be rented during the devisee's minority, and the income was made part of the residue also. And power was given to the executors to sell "the said Shot Tower property" at their discretion; to invest the proceeds in such securities as they should deem best; to pass the income into the residue; to assign the securities to the appellant when he should reach the age of twenty-one years; and, if he should die before reaching that age, to add it to the residuary fund. In the direction to rent, and in the power given to sell, the testator had no personal property in contemplation. That had been provided for. It was to go to his son if he lived till he should be twenty-one years old. It was to go into the residue if he should die in his minority. Whilst it would have passed neither to a lessee or a purchaser of the realty, its existence, availability and adaptation to the purposes of the business would have proved advantageous. It would have increased the rental value if a lease had been made, and enhanced the purchase price in the event of sale. The business was in fact carried on during the nine months of the appellant's minority by the widow of the testator. When he attained his majority, the property passed into his hands, and the original design of his father was carried out.

But the appellant's claim before the auditor embraced not only the articles that were to be worked up, but the drop-shot and buckshot which happened to be in the factory when the testator died. These were personal property upon the premises, certainly, but they were there only to await shipment to customers or transfer to the store. They were manufactured goods, articles of commerce, finished and prepared for sale. Whilst the testator was able to foresee that stock and materials for manufacture would be always in the factory, he could not anticipate what, if any, quantity of goods

[Sparks's Appeal.]

completed for the market would be left there at any point of time after his will was made.   Subject as it was to constant fluctuations in quantity, it would seem impossible that this property could have been in the testator's mind.   Business conditions can be conceived under which it would accumulate in vast volume.   And business conditions can be conceived under which the factory would be swept bare of every pound.

> It is now adjudged and decreed that the decree of the Orphans' Court be so amended and modified, that Thomas Weston Sparks shall be allowed and paid the sum of $5984.29, being the value of the manufacturing materials in and upon the Shot Tower property at the date of Thomas Sparks's death; that with this modification the said decree be affirmed; and that the costs of this appeal be paid out of the fund for distribution.